UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GEORGE L. SKAGERBERG,

    Plaintiff,        Case No. 04-CV-74961

vs.

               HONORABLE PAUL D. BORMAN
               HONORABLE STEVEN D. PEPE

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

    Defendant.
_____/

### REPORT AND RECOMMENDATION

**I. BACKGROUND**

George L. Skagerberg brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner denying his application for Childhood Disability Benefits and Supplemental Security Income payments under Title II of the Social Security Act.

**A. PROCEDURAL HISTORY**

Plaintiff who was born on October 10, 1959, applied for Childhood Disability Benefits and Supplemental Security Income payments on September 5, 2000, (R. 14, 75). He has 3 months work experience that was not substantial (R. 114, 102). After Plaintiff's application was initially denied, he had a May 7, 2002, hearing before administrative law judge (ALJ) Sharon A. Bauer who issued a decision on July 31, 2002, finding Plaintiff to be disabled. (R. 263, 24 - 25). On October 22, 2004, the Appeals Council denied Plaintiff's request for review (R. 5). A July 7, 1993, application for SSI was denied in a hearing decision on September 23, 1996, and his onset

date was amended at the hearing to this date (R. 15).[1] His childhood disability claim was deemed moot in light of the amended onset date (1996) which was well after his 22nd birthday in 1981. (Id.)

### B. BACKGROUND FACTS

#### 1. PLAINTIFF'S HEARING TESTIMONY

At his hearing on May 7, 2002, Plaintiff stated that he helps his mother around the house with cleaning, cooking and doing laundry. Plaintiff is able to bathe and dress himself and sometimes even makes a trip to the grocery to pick up items like bread and milk, although his mother does the majority of their grocery shopping. (R. 299 - 300).

Plaintiff was being treated by Dr. Laura Hasselman [Laurey Hanselman] for arthritis, hypertension, gastric ulcer, and GERD (R. 274). He takes Zestril for high blood pressure and Zoloft daily (R. 276). Plaintiff drinks 12 cans of beer four to five days a week, smokes a pack of cigarettes a day, but has never used any street drugs (R. 278, 280). Plaintiff often has difficulty sleeping and will sometimes drink in order to put himself to sleep (R. 300). Plaintiff testified that he is blind in his right eye, has hearing loss in his right ear, and is often asked to repeat himself because of difficulty with speech (R. 281, 283, 284). ALJ Bauer observed a "quite noticeable" indentation on the right side of the Plaintiffs head. The Plaintiff testified that if he sleeps on his right side he has terrible headaches "from the pressure" and cannot lean his head to the right without pain. He has had this condition since his surgery, the area is very tender and when he bumps the area of his head he suffers "brain damage." (R. 284). Whenever his head is

---

[1] An October 1997 application was denied without appeal. A second application led to an award of benefits as of June 1, 1978, terminated due to medical improvement. January 1980, December 7, 1988, and July 7, 1993, applications were also denied.

bumped or he leans his head the wrong way (which Plaintiff says occurs "a couple times in a typical day") a headache will occur for 10 to 20 minutes.  Plaintiff treats this pain with aspirin, Motrin, or Excederin, although he thinks he is now pretty immune to aspirin because he has taken it so often (R. 285, 286).  Plaintiff also stated that bright lights and the glare of snow can be blinding and give him an instant head and eye ache that can last 20 minutes to several hours (R. 285 - 286).

Plaintiff says that he was hospitalized as a teenager to remove a tumor from his brain. While removing the tumor, they also removed part of his skull.  (R. 289).  Plaintiff's radiation treatment in preparation for his surgery has left him with constant dry mouth, 'fried' saliva glands, and damaged teeth that have caused pain because of many infections due to the radiation's removal of protective enamel.  Over the counter pain killers do not help the pain; Ambesol does relieve some pain.  (R. 289 - 290).  Plaintiff's Dentist has warned that removing the teeth could cause black jaw and would require his jaw to be replaced.  Plaintiff has not been able to visit an oral surgeon because of a lack of money and he stated that his high blood pressure would complicate dental surgery.  (R. 290 - 291).  Plaintiff has been able to limit the infections in his mouth to only once or twice a month by brushing his teeth daily with salt water and peroxide (R. 291).

Plaintiff testified during his surgery much of his sinus was removed as well to prevent reoccurrence of the tumor.  As a result, he suffers from infections that can be "unbearable," although he has been able to limit the number of infections by flushing out his sinuses three to four times a day.  When he has a sinus infection he suffers from tenderness and swelling around his eyes and itchy and irritated feelings in his sinuses.  (R. 291-293).

Plaintiff often feels like he is off balance[2] and has fallen on several occasions, sometimes requiring emergency visits to the hospital and in one case 40 stitches in his elbow (R. 286 - 287). Because of falls due to a loss of balance, Plaintiff says that he has numbness in his right hand and also has aches and pains in his back and hips. To treat his pain in his back and hips he will stretch and 'pop' them and apply Ben Gay and Absorbine, Jr. (Tr. 287 - 288). Plaintiff has trouble standing and walking because of pain in his right foot that he believes was broken years ago when a beam fell on it. He was not treated for his foot injury at the time because he did not have insurance. (R. 288 - 289). Additionally, Plaintiff testifies that he tries not to bend or lean over because doing so makes his head feel tight and pressured giving him headaches (R. 294).

Plaintiff says that when he sits for 20 to 30 minutes his lower back and left hip hurt. Plaintiff can comfortably walk for about 150 yards. After that distance Plaintiff states that his hips and lower back feel like they are on fire. Plaintiff can stand for one half hour at a time. Plaintiff can lift a gallon of liquid but can do so only once. (R. 300 - 301).

Psychologically, Plaintiff testified that he has been evaluated as having a low level of intellectual functioning and is slow to understand things. He also has been diagnosed with depression or adjustment disorder for which Zoloft has helped. (R. 296).

### 2. MEDICAL EXPERT TESTIMONY

Medical Expert, Dr. David Halstead, testified at the May 7, 2002, hearing that, based on his review of Plaintiff's medical file, and his own medical opinion (having not personally

---

[2]Plaintiff describes his feelings of being off balance: "It feels like I'm falling, like things are moving. And the doctor said it might be from the ear infection. And the inner ear infection I had after one of my surgeries. And they had put a skin graft over my temple after they put a drain tube in and drained the infection. And, and then since then, I've had trouble with my balance." (R. 286)

examined him), the Plaintiff had the following anatomical physiological or psychological abnormalities:

> Alcohol abuse, no rehabilitation. A social phobia, an adjustment disorder with anxiety. Dysthymic disorder. The record does not show this explicitly. It's somewhat implicit. In it there may well be an organic brain syndrome. I think that's likely. The record is not definitive on that.

(R. 313 - 314).

Dr. Halstead testified that the Plaintiff's I.Q. of 83, was just higher than the borderline range fo 70 to 80. (R. 314). Dr. Halstead pointed out that the patient's dysthymic disorder is a depressive syndrome but that it is not as severe as major depression (R. 316). Dr. Halstead also noted that there was some history of suicidal thoughts and recurrent severe panic attacks in the record (R. 315 - 316).

Dr. Halstead's evaluation of the Plaintiff's ability to participate in daily activities was that he could do some things but not others. He added that Plaintiff suffered from moderate social anxiety and phobia. (R. 218 - 221). Dr. Halstead acknowledged repeatedly that his evaluation was colored by the fact that he believed that the Plaintiff suffers from an organic brain condition that was not specifically identified anywhere in the medical records. (R. 312 - 326).

### 3. MEDICAL EVIDENCE

Plaintiff's medical problems go back at least three decades[3], however the records provided to the ALJ only cover Plaintiff's medical visits over the nine year period from

---

[3] During his visit to Dr. Pestrue in October, 2003, Plaintiff recounted the onset of his medical problems: "I had the tumor in '73 and in '75 they operated on it...I had a series of operations that started in '75...Not counting the biopsies there were probably nine...I had a trach two times. That was related to the tumor...I had radiation therapy for the tumor too...I guess that's what messed up my saliva glands." (R. 211).

5

September of 1993 to May 2002 (R. 151 - 248).

In September of 1993, Plaintiff was evaluated by Dr. Edwin J. Westfall.  Dr. Westfall reported that the Plaintiff complained of blindness in his right eye (which causes pain and is subject to recurrent infections), faintness and concerns of a loss of balance, constant headaches, dry mouth, deteriorated and broken teeth, pain in his jaws and occasional panic attacks.  (R. 206).  Dr. Westfall observed: "marked deformity of the right side of the head and face.  There is marked depression of the right side of the head and inferior displacement of the eye socket.  There is severe deterioration of the teeth with many missing and broken and discolored."  (R. 207, 208).  The Doctor also observed conjunctivitis of the right eye, the ability to hear conversational speech, clear speaking, and unimpaired walking.  Plaintiff's examination showed no abnormalities with regard to his skin, neck, chest, heart, abdomen, range of motion in his extremities.  Dr. Westfall did note Plaintiff's visual acuity to be 20/blind in the right eye and 20/70 in the left, without glasses.  A neurological exam showed normal reflexes and sensory function except for paralysis of the right side of the soft palate.  (R. 207).  Dr. Westfall concluded that Plaintiff's medical difficulties were residual problems from the removal of a brain tumor and the subsequent 24 radiation treatments in 1975 (R. 208).

On October 20, 1993, Plaintiff saw George Pestrue, Ph.D. for a consultative examination.  Dr. Pestrue noted that the Plaintiff complained of numbness in his right hand, a fear of falling down when he loses balance, pain in his back, headaches, and pain and fogginess in his right eye.  Dr. Pestrue also noted that in addition to these medical problems Plaintiff suffers from "an apparent major depressive disorder" and quoted the Plaintiff as saying: "Most of the time I just want to be left alone by myself...I feel miserable...There's not much in my life to be happy

about...I cry some...I'm disappointed...I feel lost." (R. 210 - 211).[4]

Plaintiff acknowledged alcohol abuse when he was younger, and that today he will drink 10 to 12 cans of beer once a week. Plaintiff said that he had used marijuana within the last few years, and currently smokes half a pack of cigarettes per day. (R. 213). His hobbies consist of listening to the radio, watching TV and playing with his nephew. He doesn't "care much about hunting and fishing" and he has "lost interest in it." (R. 213). Plaintiff described a typical day: "Usually its not till late when I get up. I usually watch TV most of the night...I'll get up probably about 11:00...It usually takes me a couple of hours to wake up...I watch TV and go through the paper...By noon my nephew is there. I guess my typical day is watching TV and watching my nephew...It's the same thing in the evenings...I go to bed about 2 o'clock in the morning." (R. 214).

Dr. Pestrue described the Plaintiff as mildly anxious and mildly depressed (R. 216). He noted the physical deformities on the right side of Plaintiff's face, said he was friendly and in touch with reality, spontaneous and logical, free from a history of hallucinations or delusional ideation, but suffered from 'very poor' self esteem. (R. 214 - 215). When Dr. Pestrue asked the Plaintiff about suicidal thoughts the Plaintiff said that "he had thought about it" but that he has never attempted it nor was he currently a suicidal threat. (R. 215).

Dr. Pestrue diagnosed major depression, noting that Plaintiff suffered from a moderately

---

[4] Doctor Pestrue interviewed the Plaintiff about his personal history and social functioning. Plaintiff stated that he was removed from school after the tumor was discovered because the school insurance didn't cover him. Plaintiff noted that during his highschool years, he "didn't even have any hair at the time and with the skull missing I was quite a sight...." Regarding his marital history, he said he has never been married, and that he has no children, noting: "I can't have kids after the radiation...That's what the doctor said." As far as his love life is concerned: "When I was 19 I had a girl live with me for a couple of years and that was it...We just didn't get along...I'm interested in girls, but it just doesn't happen."

depressed mood, significant dyssomnia, participated in few pleasurable activities, few social activities, felt miserable all of the time and avoided social contacts. Dr. Pestrue also noted that Plaintiff had the psychosocial stressors of his medical problems, inability to maintain a job, no money, and living with his mother. Finally, Dr. Pestrue suggested that the client should obtain mental health treatment (R. 218).

In December of 1993, Plaintiff saw Dr. Hanley who evaluated his eye sight and indicated "a severe deficit on the right" (R. 220 - 221).

Dr. Bradley S. Hass saw the Plaintiff for a medical evaluation on June 18, 1994, regarding Plaintiff's complaints of brain tumor residuals (R. 222). Dr. Haas summarized Plaintiff's medical history and problems. Dr. Haas noted that the Plaintiff

> has had seven surgical procedures via the right temporal approaches via the right temporal approach, three surgical approaches via the maxillary area, and three surgeries via his right anterior cervical area. Because of the repeated surgeries as well as the debulking of the tumor, there has been a problem with would healing of the bone, resulting in a significant depression of the skull over the right temporal area resulting in disfigurement and a right eye stabismus. He has been left with arthralgias involving his neck, the jaw on the right, his right elbow, shoulder, hip, wrist, and both the lumbar as well as the cervical spine. ... There has been no injury with the exception of his previously mentioned surgeries.

(R. 222).

Dr. Haas' physical examination yielded the following results and observations: Plaintiff had no limitation on hearing conversational speech; there is mild difficulty in understanding Plaintiff's speech; he has a curvolinear craniotomy scar over the right temporal area which left his face and head depressed and disfigured; several well healed scars were elsewhere on his face; his teeth were severely rotten and small; his walking was unimpaired; his skin was normal; his vision was blind in the right eye and 20/50 in the left without glasses; normal neck; no murmurs

or gallops in his heart; normal chest and abdomen; and nothing of note regarding his extremities. (R. 224). Dr. Haas concluded that the tumor left Plaintiff with a loss of vision involving his right eye as well as disfigurement; with pain in his temporal mandibular joint; his speech mildly difficult to understand; and some accompanying depression. Dr. Haas further concluded that Plaintiff has some limitation of his cervical spine and severe dentition decay. (R. 225).

On August 8, 1994, Plaintiff returned to Dr. Pestrue for another consultative exam in which Dr. Pestrue focused on changes that have occurred in the Plaintiff's life since he was last seen in October of 1993 (R. 226). The Plaintiff said:

> I'd say the pain is more severe...It keeps getting worse and worse...My teeth are rotting right out of my face...My headaches are getting a lot worse...A lot of times they last all day...They get stronger and lesser and stronger and lesser all day long...The pains in my right eye are getting worse...I can't see with it. It's like looking through intense fog...I just don't give a shit about things anymore...I always feel like shit...I'd rather be sleeping than doing anything to be honest with you...When I sleep I don't think about anything...Nothing matters to me...When I'm sleeping I'm not in pain...My back is sore all the time...It's about the same.

(R. 226)

Plaintiff further reported on his use of alcohol and street drugs, social interactions, and his activities and interests. Regarding his alcohol and drug use Plaintiff said: "Whenever I get [alcohol] I'll drink it. It's a couple times a week...I smoke a joint once in awhile, maybe once a month. It helps me sleep. I'm down to a half a pack [of cigarettes] a day." (R. 227). Plaintiff says that he gets along well with his family and with his neighbors but that he doesn't have and close personal friends. "One friend brought me here today...I don't see the other friend...I drink beer with him sometimes...That's about it...I'd rather be left alone...The more I'm left alone the more I like it." (R. 227). Plaintiff stated that his interests were limited to watching TV, sleeping, and watching animals run around outside. As far as chores are concerned, Plaintiff

vacuums and does the dishes. (R. 228). Plaintiff is not taking any prescription medications (R. 226).

Dr. Pestrue observed that Plaintiff appeared mildly lethargic, angry, unmotivated for most of life's usual activities, and had very low self esteem. Plaintiff's mental activity was passive but reasonable and logical with no evidence of hallucinations or delusional ideation. Plaintiff appeared not to be suicidal although he expressed significant feelings of worthlessness. He had moderate success when Dr. Pestrue tested his skills in memory, information, calculation and abstract thinking. (R. 232). In intelligence testing, Plaintiff had the following scores: PPVT-R word recognition I.Q. score of 90, percentile ranking of 25 and a mental age of 20 years-5 months; WAIS-R verbal I.Q. score of 83; WAIS-R performance I.Q. score of 89; WAIS-R full scale I.Q. score of 84.[5] (R. 232).

Dr. Pesture diagnosis consisted of: major depression, single episode, severe, without psychotic symptoms; alcohol abuse, borderline intellectual functioning, psychological stressors consisting of medical problems, inability to maintain job, financial problems, not having a car, and living with his mother. Dr. Pestrue's prognosis was guarded and he suggested the Plaintiff

---

[5] With regard to the Plaintiff's intelligence testing, Dr. Pesture further noted:
> His highest capacity was in the area of general judgment and comprehension. His lowest capacity was in the area of arithmetic. His scores in reading, spelling and arithmetic on the WRAT-R were also below the normal range. In reading he achieved an I.Q. equivalent score of 80, with a percentile ranking of 9, and a grade level of the end of the 8th grade. In spelling he achieved an I.Q equivalent score of 67, with a percentile ranking of 1, and a grade level of the beginning of the 4th grade. In arithmetic he achieved an I.Q. equivalent score of 73, with a percentile ranking of 4, and a grade level of the end of the 6th grade. He appears to have a combined cognitive/verbal skills in the borderline defective range.

(R. 232).

obtain mental health treatment. (R. 233).

From January 9, 1997, to October 29, 2001, Plaintiff had several visits to the Mid Michigan Medical Offices. (R. 175 - 204). On January 9, 1997, he was briefly examined with the following observations being made: the right part of his cranium was missing; can only see white and has some peripheral vision in his right eye; hypertension was not well controlled; had a history of neck pain; and his blood pressure was 172/120 and then reassessed at 142/110. Plaintiff was instructed to take 10 mg of Zestoril daily to help with his blood pressure, and was asked to come back in a week to reassess his condition. (R. 184 - 185). Upon his return visit on January 20, 1997, Plaintiff says that his headaches are much improved as is his blood pressure (120/70). Plaintiff's cholesterol is elevated, as is his HGB and HCT. Plaintiff began treatment for a sinus infection using Bactrim DS and Entex LA. (R. 183-184). On his next visit (January 23, 1997) it was noted that his blood pressure had gone up to 130/98 as a result of his cutting his Zestoril in half because he was running low and had not yet had his medicaid approved. (R. 183). When Plaintiff returned to have his DSS forms filled out on February 24, he complained of head cold and sinus problems. Plaintiff also was observed to have very bad teeth and that his teeth problems may be impacting his sinus infection. Plaintiff was then given Amoxicillin and Donamine SR to help with his sinus problems. His blood pressure appeared to be under control (110/80) since he increased taking of his medication at the prescribed level. (R. 182). Six months passed before his next visit on August 5, 1997, in which he complained of discomfort, nasal discharge, increased facial tenderness and an ear or a sinus infection. Plaintiff's blood pressure was fine at 120/80, his ears are clear but he did have postnasal drainage. (R. 181). The physician also recommended that he have all his teeth removed and should begin using dentures,

and made some changes to his prescriptions.[6]

On Plaintiffs next visit to the Mid Michigan Medical Offices on June 8, 1998, he complained of some soreness in his shoulders, hips, knees and ankles. Plaintiff indicated that he would like help with his depression. Plaintiff suffered from hypertension and continues to take Zestoretic. He had gastroesophageal reflux disease and was told to begin taking Prevacid 30 mg daily. His arthritis has been helped by taking DayPro. (R. 179 - 180). The Plaintiff returned on July 23, "feeling much better." (R. 178) He had no reflux symptoms. His arthritic pains were gone, he had very little neck and jaw pain, although he noted that his pains are more severe in the winter.

The Plaintiff's next visit to the Mid Michigan Medical Offices was on August 10, 2000. The Plaintiff reported that he was abusing alcohol, was anxious, stressed, not sleeping well and was experiencing mood swings. Plaintiff also reported that he had stopped taking his medications and agreed to begin. Plaintiff had hypertension, hyperlipidemia, reflux, osteoarthritis and an adjustment disorder with anxiety. (R. 176 - 177). Plaintiff made his final visit to the Mid Michigan Medical Offices on September 29, 2000. Plaintiff reported that Zoloft was helping with his adjustment disorder. Plaintiff's hypertension and reflux were well controlled with medication and he was sleeping much better. Plaintiff suffered degenerative joint disease and hyperlipidemia. (R. 175).

Dr. Pestrue saw Plaintiff on January 31, 2001, and reported that Plaintiff's complaints and symptoms involved his medical problems, dysthymia, a social phobia and some learning

---

[6] From the doctors notes: "I am going to change him to Zestoretic 10/12.5, start him on Augmentin 875 mg bid and Claritin D. Flonase nasal was provided to him. ... Also, DayPro for arthritic complaints are administered as well."
(R. 180).

problems (R. 151). Dr. Pestrue observed that Plaintiff "walked slowly with a mild limp and with some stiffness." (R. 155). His facial expression was alert although mildly depressed and that he "exhibited a mild to moderate articulation impairment. (R. 155). Plaintiff reported on hallucinations, trouble sleeping and a recent weight loss. (R. 155 - 156). Dr. Pestrue administered several psychological tests which he considered to be "a valid statement of his mental skills." (R. 158).

> On the PPVT-R the client achieved a receptive word recognition standard score of 82, with a percentile ranking of 12, and a mental age of 16 years - 1 month. On the WAIS - III he achieved a verbal I.Q. score of 86, a performance I.Q. score of 81, and a full scale I.Q. score of 83. His verbal comprehension index was 91, while his perceptual organizational index was 88. His working memory index was 73, while his processing speed index was 71. There was moderate verbal subscale scatter. His worst verbal skills were in the areas of arithmetic and attention span. His best skills were in the areas of general comprehension, accumulated information and semantic vocabulary. On WRAT - 3 his spelling and arithmetic scores were both below the normal range. In spelling he achieved a standard score of 70, with a percentile ranking of 2, and a grade level of the 5th grade. In arithmetic he achieved a standard score of 71, with a percentile ranking of 3, and a grade level of the 4th grade. In reading he achieved a standard score of 87, with a percentile ranking of 19, and a grade level of high school. In general his cognitive/verbal and visual-motor skills varied from the borderline defective range to the normal range. Based on a verbal I.Q. score of 86 on the WAIS-III his combined verbal intelligence is considered to be in the low-normal range. He does appear to have developmental delays in the areas of spelling and arithmetic.

R. 158.

Doctor Pestrue's diagnosed dystymia, social phobia, and alcohol abuse (R. 159).

Plaintiff visited Psychiatrist, Dr. Ronald E. Fine, for a psychiatric review on February 26, 2001. Dr. Fine reported that he had insufficient evidence to make any findings because Plaintiff failed to cooperate. (R. 161).

Dr. Hanselman examined Plaintiff in order to help determine whether he was eligible for SSI. Dr. Hanselman concluded that he was "a qualified candidate especially in relation to his

13

history. People are afraid to hire him in relation to his facial region and for fear of injury." (R. 238). Dr. Hanselman noted that the Plaintiff had hypertension, GERD, hyperlipidemia, a history of brain tumor, depression, and he recommended that Plaintiff cease smoking. (R. 238 - 239).

### 4. VOCATIONAL EVIDENCE

James Lozer served as the Vocational Expert and was examined by ALJ Bauer, as well as Plaintiff's attorney, on May 7, 2002 (R. 326). ALJ Bauer laid out a hypothetical. A person of similar age, education and work history as the Plaintiff with the following restrictions: the individual can stand and walk for up to 20 minutes at a time; can sit for 60 to 90 at a time; can do all of these three for at least 8 hours during a work day as long as they can change positions; they can lift, carry push and pull 10 pounds frequently, 50 pounds occasionally; because of the loss of vision in one eye they should not work around ladders, ropes, or scaffolds; should not climb or work around unprotected heights or hazards, or work around hazardous machinery. Any job cannot require this hypothetical person to speak well, read beyond a high school level, spell beyond a fifth grade level, or do arithmetic beyond a fourth grade level. Their work would be limited to simple, unskilled, repetitive routine work that would be considered low stress; nonresponsible to general public contact; ability to work primarily alone. (R. 327 - 328). The VE testified that the hypothetical worker was suited for the following sedentary positions:

        1,500   packager or sorter (in the state)
        1,500   security monitor guards (in the state)
        1,500   visual inspectors (in the state)
        10,000 assembler of small parts (in the state)

(R. 329).

### 5. THE ALJ'S DECISION

ALJ Bauer found that Plaintiff had not engaged in substantial gainful activity during the relevant period, and that the Plaintiff suffers from severe impairments including: "blindness in the right eye, mild to moderate articulation impairment, dysthymia, social phobia, and alcohol abuse." (R. 24). These impairments did not meet the requirements or equal the level of severity contemplated under any listing included in Appendix 1 to Subpart P, Regulations No. 4. (R. 24).

ALJ Bauer also found the Plaintiff's complaints of disabling symptoms and limitations to lack credibility. (R. 24).

ALJ Bauer found the Plaintiff to have a residual functional capacity to perform work except for "lifting, carrying, pushing, and pulling more than 50 pounds occasionally and ten pounds frequently; climbing ladders, ropes, and scaffolds; working around hazards, at unprotected heights, or around hazardous machinery; performing more than simple, unskilled, repetitive, routine, rote, low stress jobs; having more than non-responsible or irregular general public contact that is brief and superficial; and performing jobs requiring good speaking ability or telephone skills. The claimant must work primarily alone. He can read at a high school level, spell at the fifth grade level, and perform fourth grade arithmetic." (R. 24).

ALJ Bauer also found that the Plaintiff falls in the 'younger' and 'limited education' categories. Using Medical-Vocational rule 201.24 as a framework for decision-making he found that even with the Plaintiff's limitations, there are still "a significant number of jobs in the national economy that he could perform." He used the examples of sedentary jobs that VE Lozer identified: "such jobs include work as a packer/sorter, a security monitor, an inspector, and an assembler." (R. 24). Therefore, ALJ Bauer decided that the Plaintiff "is not entitled to

Childhood Disability Benefits and is not eligible for Supplemental Security Income payments under ... the Social Security Act. (R. 24).

## II.  ANALYSIS

### A. STANDARDS OF REVIEW

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence.  See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

### B. FACTUAL ANALYSIS

Plaintiff raises three challenges to the Commissioner's decision: (1) ALJ Bauer disregarded medical evidence of record and her decision is not supported by the evidence; (2) ALJ Bauer failed to give proper weight to the report of the Plaintiff's treating physician; (3) ALJ Bauer made an error of law by failing to apply all of Rule 201.00(h).

The Plaintiff argues that ALJ Bauer did not address every impairment that the medical record and Plaintiff's testimony present. (Plaintiff's Brief, pp. 5 - 13).  Yet, a review of the

record demonstrates that ALJ Bauer's opinion is supported by substantial evidence and should be upheld.  *See Studaway v. Sec'y of HHS*, 815 F.2d 1074 (6th Cir. 1987).  ALJ Bauer's weighing of the evidence was within his broad discretion as fact finder.  Here, ALJ Bauer's decision was reasonable based on the evidence before her and should be upheld.

The ALJ is not required to evaluate in writing every piece of testimony.  *See Anderson v. Bowen*, 868 F.2d 921, 924 (7th Cir. 1989) ("Instead, we are interested in knowing that the Secretary has considered and discussed the important evidence, including all medical evidence that is credible, supported by clinical findings and relevant to the question at hand." (citations and internal quotation marks omitted)).

Here, ALJ Bauer addresses much of the medical evidence as well as Plaintiff's testimony and Medical Expert Halstead's opinions in reaching his decision.  Where, as is the case here, an ALJ could find substantial evidence for a particular outcome, contrary evidence does not require a different conclusion.  *See Jones v. Comm'r of Social Security*, 336 F.3d 469, 477 (6th Cir. 2003) ("the Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ").  While an ALJ is not permitted to discredit evidence only because it supports a disability finding, here ALJ Bauer's weighing of the evidence was within the permissible range of his broad discretion as fact finder. For reasons stated above, even were this Court to disagree with ALJ Bauer's ultimate determination, it could not alter it because under the standards of §405(g) of the Social Security act and cases interpreting it, there is substantial evidence in the record to uphold the Commissioner's finding.

Additionally, Plaintiff argues that ALJ Bauer's decision is contrary to the fact that Dr.

Pestrue "has evaluated Plaintiff three times over an eight year period, consistently concluding that Plaintiff is unable to work." (Plaintiff's Brief, p. 10). A doctor's opinion that a patient is disabled does not have controlling weight in a social security case on the ultimate issue of disability which is reserved to the administrative decision maker. *See* 20 C.F.R. 404.1527(e) ("Opinions on some issues . . . are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner"); 404.1527(e)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled"); 404.1527(e)(3) ("We will not give any special significance to the source of an opinion on an issue reserved to the Commissioner"); *see also Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) ("[A] claimant is not entitled to disability benefits simply because her physician states that she is 'disabled' or unable to work").

Next, Plaintiff argues that ALJ Bauer did not give proper weight to Plaintiff's treating physician. As ALJ Bauer noted, Plaintiff's treating physician's opinions rely more heavily on Plaintiff's subjective reports than on any objective evidence. *See Cohen v. Sec'y of HHS*, 964 F.2d 524, 528 (6th Cir. 1992) ("The ALJ, however, is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation."). Although "in determining whether a claimant is entitled to disability insurance payments, medical opinions and diagnoses of treating physicians are entitled to great weight, and if uncontradicted, are entitled to complete deference", *id.,* such opinions regarding disability are not conclusive. *Houston v. Sec'y of HHS,* 736 F.2d 365, 367 (6th Cir. 1984). Rather, the ultimate decision of disability rests with the ALJ, not the treating physician, *id.,* and the Commissioner is "not bound by the opinion of a treating physician where there is substantial evidence to the contrary." *Loy v. Sec'y of HHS*, 901 F.2d 1306, 1308 (6th Cir. 1990) (*citing*

18

*Lashley v. Sec'y of HHS*, 823 F.2d 922, 927 (6th Cir. 1987)).

Finally, Plaintiff argues that ALJ Bauer did not apply all of Rule 201.00(h). (Plaintiff's Brief, p. 13 - 17). ALJ Bauer specifically addressed Plaintiff's argument that Plaintiff is entitled to benefits through application of rules 201.00(h) and 201.24:

> The attorney has argued that the claimant meets the requirements of Medical-Vocational Rules 2001.00(h) and 201.24 and is therefore entitled to benefits. Rule 201.00(h) applies to those younger individuals who are restricted to sedentary work, are unskilled or have no transferable skills, have no past relevant work or can no longer perform past relevant work, and are either illiterate or unable to communicate in English. The claimant is not illiterate or unable to communicate in English. For this reason the undersigned rejects the attorney's argument Further, Rule 201.24 directs a finding of "not disabled."

(R. 23).

The fact that ALJ Bauer did not specifically address the fact that in this case she is permitted to make a finding of disabled according to Rule 201.00(h) even though the Plaintiff is literate and can communicate in English, does not constitute an error of law.[7]

### III.    RECOMMENDATION:

Accordingly, for the above stated reasons IT IS RECOMMENDED that Defendant's motion be GRANTED and Plaintiff's motion be DENIED.

The parties to this action may object to and seek review of this report and recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C.. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific

---

[7] *Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990), also makes it clear that the example set out in § 201.00(h) was merely illustrative of a case involving a younger person in which "an ALJ is `not precluded' from finding a disability" for those individuals who would otherwise meet a "not disabled" grid category "but for their inability to perform the full range of sedentary work." *Id.* at 927. *Abbott* rejected plaintiff's contention that § 201.00(h) "directs a finding of disabled whenever a claimant's case presents analogous facts." *Id.* Plaintiff's argument under § 201.00(h) must be rejected for similar reasons.

objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985);  *Howard v. Sec'y of HHS*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this report and recommendation. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge. Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: December 12, 2005                     s/Steven D. Pepe
Ann Arbor, Michigan                          UNITED STATES MAGISTRATE JUDGE

Certificate of Service

    I hereby certify that a copy of the above was served upon the attorneys of record by electronic means or U. S. Mail on December 12, 2005.

                                                    s/William J. Barkholz
                                                    Courtroom Deputy Clerk